**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**BLAIR W. CLOVER, III,**          )
                                   )
      **Plaintiff,**               )
                                   )
                                   )    **Civ. 15-719**
                                   )
**CAROLYN W. COLVIN,**             )
**Acting Commissioner of Social**  )
**Security,**                      )
                                   )
      **Defendant.**               )

## OPINION

### I. Introduction

This case is before us on appeal from a final decision by the defendant, Commissioner of

Social Security ("the Commissioner"), denying the claim of Plaintiff Blair W. Clover, III

("Clover") for disability insurance benefits and supplemental security income under Title II and

Title XVI of the Social Security Act. Clover filed his Complaint seeking judicial review

pursuant to 42 U.S.C. § 405(g), [ECF No. 3], and the parties have submitted cross-motions for

summary judgment with briefs in support.[1] [ECF Nos. 10-13]. Clover also has filed a reply

brief. [ECF No. 14]. The Commissioner's motion seeks affirmance and Clover's motion seeks

remand. For the reasons stated below, we will deny Clover's motion and grant the

Commissioner's motion, thus affirming the decision that Clover is not entitled to disability

insurance benefits and supplemental security income.

---

[1] As observed by Oberley v. Colvin, 2014 WL 2457398 at *1 n.1 (W.D.Pa. May 30, 2014), although Federal Rule of
Civil Procedure 56 does not govern the District Court's judicial review of the Commissioner's decision under the
act, cross-motions for summary judgment are employed by the parties to provide a method for consideration of their
respective positions.

## II. Procedural History

Clover applied for Disability Insurance Benefits and Supplemental Security Income under Title II and Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381-1383f on July 12, 2012, alleging disability as of March 6, 2006. Clover's date last insured for purposes of Title II was June 30, 2011. R. at 13. Clover's claim was initially denied on August 21, 2012 and Clover made a timely written request for hearing on September 28, 2012. Administrative Law Judge ("ALJ") Natalie Appetta held a hearing on September 30, 2013, R. at 32-74, at which Clover appeared and testified as did Marybeth Kopar, an independent vocational expert ("VE"). R. at 32. Clover was represented at the hearing by prior counsel, James R. Schmidt, Esq. R. at 32. The ALJ indicated that the record would be kept open for 30 days to permit submission of updated records. R. 74. Additional records were submitted by Clover's counsel even after that 30 day period and considered by the ALJ as acknowledged in the ALJ's decision. R. at 13 (citing Exs. 17F and 18F); R. at 447 (November 20, 2013 correspondence from Clover's counsel [enclosing Ex. 17F Dr. Brockmeyer 9/12/13 IME]); R. at 451 (October 31, 2013 Correspondence from PCP Dr. Egan and Dr. Egan treatment notes from 9/5/12 to 10/31/13 [Ex. 18F]).

By decision dated December 20, 2013, R. at 13-27, the ALJ determined that Clover was not disabled under §§ 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act from May 13, 2006 through the date of decision, December 20, 2013. R. at 12-13. On the alleged disability onset date of May 13, 2006, Clover was 43 years old, placing him in the age category of younger person, however, as of April 5, 2013, when Clover turned fifty (50), his age category changed to person closely approaching advanced age under the regulations. 20 C.F.R. §§ 404.1563(c) & (d), 416.963(c) & (d).

2

The ALJ found that Clover has the following impairments: right knee derangement status-post partial knee replacement, status-post resection of arthrofibrosis, synovectomy, partial meniscectomy with stable anterior cruciate ligament (ACL), and chondromalacia patella; left knee derangement status-post arthroscopy; and diabetes mellitus, which conditions are severe as they cause more than minimal limitations on Clover's abilities to perform basic work activities. R. at 16. The ALJ indicated that the medical records reflected that Clover had non-severe impairments of hypertension, hyperlipidemia, low back pain, dysarthria and cerebrovascular disease. R. at 16. The ALJ also found that Clover has obesity, which requires consideration of the additional and cumulative effects, if any, in determining whether Clover's medically determinable impairments are severe, whether the impairments meet or equal any listing, and in determining Clover's residual functional capacity ("RFC"). R. at 16 (citing SSR 02-1p [Evaluation of Obesity]). The ALJ observed that Clover testified at the hearing that he had eye surgery on August 14, 2013 for a retinal detachment and diabetic retinopathy with no vision in the left eye, but there were no objective medical findings of record to substantiate the diagnosis of diabetic retinopathy or loss of vision. R. at 16. Thus, the ALJ found that Clover's issues with vision were not "medically determinable." R. at 16. Similarly, the ALJ observed that although there was a reference in Clover's primary care physician records provided post-hearing to an "acute kidney injury" as of August 2013, there also were no objective clinical or laboratory findings regarding same. R. at 16. The ALJ further determined that none of Clover's impairments or combination of impairments meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 16.

As to Clover's RFC, the ALJ found that Clover has the RFC to perform

3

light work, but has the following additional limitations of no climbing ropes, ladders, scaffolds, no climbing stairs as a requirement of the job, no kneeling and no crawling but [he] can perform other postural maneuvers occasionally. He should avoid hazards including unprotected heights, dangerous machinery, and moving machinery; avoid vibrations, including vibrating machinery and equipment. In addition, [he] must use [a] cane for ambulation.

R. at 17.

In ruling, the ALJ made the following credibility determination:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

R. at 19.

Regarding his ultimate ruling that Clover is not disabled from May 16, 2006 through the

date of decision on December 20, 2013, ALJ Appetta stated:

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

R. at 27.

Clover timely filed for review by the Appeals Council of the ALJ's determination that he was not disabled under the Act. He submitted to the Appeals Council for its consideration an additional 105 pages of medical records from UPMC Mercy Hospital ("UPMC Mercy records") regarding his asserted eye condition that were not submitted to the ALJ. R. at 4 (citing Ex. 19F UPMC Mercy records dated August 9-14, 2013). Review was denied by the Appeals Council on April 1, 2015. R. at 1. Thus, the ALJ's decision became the Commissioner's final decision for purposes of our review. Having exhausted his administrative remedies, Clover filed the instant

action seeking judicial review of the final decision of the Commissioner of Social Security denying his application. With leave granted June 2, 2015, [ECF No. 2], Clover proceeds *in forma pauperis*.

## III. Standard of Review

The Congress of the United States provides for judicial review of the Commissioner's denial of a claim for benefits. See 42 U.S.C. § 405(g)(2012). This court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. See id. "Substantial evidence has been defined as 'more than a mere scintilla,'" Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999) (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995)), but "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). This standard also has been referred to as "less than a preponderance of evidence but more than a scintilla," Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002), and does not permit the reviewing court to substitute its own conclusions for that of the fact-finder. See id; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry). Nevertheless, "[a]n ALJ must explain the weight given to physician opinions and the degree to which a claimant's testimony is credited." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011). The ALJ's decision will not be reversed if supported by substantial evidence and decided according to correct legal standards. Id. To

5

determine whether a finding is supported by substantial evidence, the district court must review

the record as a whole. 5 U.S.C. § 706(1)(F).

Relevant here as Clover submitted evidence after the ALJ issued her decision on his

claim, the Court of Appeals for the Third Circuit has summarized our options on review:

> when the Appeals Council has denied review the district court may affirm,
> modify, or reverse the Commissioner's decision, with or without a remand based
> on the record that was made before the ALJ (Sentence Four review). However,
> when the claimant seeks to rely on evidence that was not before the ALJ, the
> district court may remand to the Commissioner but only if the evidence is new
> and material and if there was good cause why it was not previously presented to
> the ALJ (Sentence Six review).

Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001)(emphasis added). For purposes of district

court review, "the 'record' is 'the evidence upon which the findings and decision [of the ALJ]

complained of are based." 239 F.3d at 594 (quoting 18 U.S.C. § 405(g)(Sentence Three)).

Thus, where as here, evidence was submitted for consideration after the ALJ's decision,

although that evidence is part of the "administrative record on appeal, it cannot be considered by

[this court] in making its substantial evidence review once the Appeals Council has denied

review." 239 F.3d at 593. "Instead, the Act gives the district court authority to remand the case

to the Commissioner, but only if the claimant has shown good cause why such new and material

evidence was not presented to the ALJ." 239 F.3d at 594 (emphasis added). Thus, where the

claimant is not entitled to a remand under Sentence Four review and provides additional

evidence not before the ALJ, "a claimant must satisfy all three requirements of Sentence Six

(new, material and good cause) in order to justify a remand." 239 F.3d at 594 (citing Szubak v.

Sec'y of HHS, 745 F.2d 831, 833 (3d Cir. 1984)).

6

## IV. Five-Step Evaluation Process for Determining Disability under the SSA

Under the SSA, the term "disability" is defined as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months. . . .

42 U.S.C. § 423. A person is unable to engage in substantial activity when he:

> is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . .

42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A).

In determining whether a claimant is disabled under the SSA, a sequential evaluation process must be applied. 20 C.F.R. § 416.920(a). See McCrea v. Commissioner of Social Security, 370 F.3d 357, 360 (3d Cir. 2004). The evaluation process proceeds as follows. At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity for the relevant time periods; if not, the process proceeds to step two. 20 C.F.R. § 416.920(b). At step two, the Commissioner must determine whether the claimant has a severe impairment or a combination of impairments that is severe. 20 C.F.R. § 416.920(c). If the Commissioner determines that the claimant has a severe impairment, he must then determine at step three whether that impairment meets or equals the criteria of an impairment listed in 20 C.F.R., part 404, Subpart P, Appendix. 1. 20 C.F.R. § 416.920(d).

The ALJ also must determine the claimant's residual functional capacity; that is, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 416.920(e). The ALJ is not required to

7

uncritically accept Plaintiff's complaints. See Chandler, 667 F.3d at 363. The ALJ, as fact finder, has the sole responsibility to weigh a claimant's complaints about his symptoms against the record as a whole. See 20 C.F.R. §§ 404.1529(a), 416.929(a).

If the claimant does not have an impairment which meets or equals the criteria, at step four the Commissioner must determine whether the claimant's impairment or impairments prevent him from performing his past relevant work. 20 C.F.R. § 416.920(f). If so, the Commissioner then must determine, at step five, whether the claimant can perform other work which exists in the national economy, considering his residual functional capacity, age, education and work experience. 20 C.F.R. § 416.920(g). See also McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000). The Commissioner bears the burden of proving that, in light of his RFC or limitations, there is other work in the national economy that he can perform. See Heckler v. Campbell, 461 U.S. 458, 460 (1983); Matthews v. Eldridge, 424 U.S. 319, 336 (1976); Sykes, 228 F.3d at 263.

## V. Discussion

Clover challenges as error: 1) the Appeals Council's apparent conclusion that the additional medical records submitted to the Council on review relating to Clover's vision impairments did not constitute new and material evidence, asserting that he had good cause for not presenting the evidence to the ALJ; and 2) that the ALJ in her determination of Clover's RFC failed to properly account for Clover's need to use a cane and the VE improperly included as jobs that Clover supposedly could perform ones that require a worker to use their hands frequently to constantly, which Clover argues he cannot perform due to his need to use a cane. [ECF No. 11 at 3]; R. at 3.

8

Clover seeks through his summary judgment motion remand for a new hearing. [ECF No. 11 at 13]. The Commissioner likewise seeks summary judgment, arguing that the ALJ's decision that Clover was not disabled is supported by substantial evidence in the form of the VE's testimony and that Clover cannot satisfy the new, material and good cause Sentence Six standard required for a remand regarding consideration of the UPMC Mercy records. [ECF No. 13 at 2]. We first address consideration of the UPMC Mercy records pursuant to the new, material and good cause standard under Sentence Six.

A. <u>Sentence Six Remand Request</u>

Clover recognizes that he must show good cause for failing to submit the records to the ALJ for her review and consideration. "The burden of demonstrating good cause rests with the plaintiff." <u>Shuter v. Astrue</u>, 537 F. Supp. 2d. 752, 758 (E.D. Pa. 2008). Clover argues based on admitted speculation that prior counsel must have timely requested the records but not received them in time for submission to the ALJ. We find <u>Shuter</u> instructive. In <u>Shuter</u>, the district court found that good cause was not shown where the claimant argued attorney error as the basis for good cause, claiming that there was a misunderstanding between the claimant and his attorney. The court in <u>Shuter</u> observed that the claim of attorney error was unsubstantiated and unexplained, and thus, it did not constitute good cause. 537 F. Supp. 2d at 760 & n.11 . <u>See</u> <u>also</u> <u>Taylor v. Commissioner of Soc. Sec.</u>, 43 F. App'x 941, 943 (6th Cir. 2002) (alleged incompetence of first attorney in not presenting evidence that existed at time of hearing not good cause); <u>Shank v. Barnhart</u>, 2002 WL 1839163 (E.D. Pa. Aug. 9, 2002) (lost record of claimant's oral hearing was good cause). The court further observed in <u>Shuter</u> that neither the claimant nor

9

counsel submitted an affidavit to the court to explain the alleged good cause, and the record was bare as to the details. 537 F.Supp.2d at 758-759.

"[U]nder the third requirement of a sentence six remand, a plaintiff has the burden of proving good cause for not submitting the evidence in a timely manner. A plaintiff is required to 'act with reasonable promptness' in obtaining evidence." Lindsey v. Astrue, 2010 WL 3703292, at *6 (W.D. Pa. 2010) (citing 20 C.F.R. §§ 404.940(b)(1); 416.1540(b)(1)). As aptly observed by the court in Lindsey, a plaintiff's failure to act with reasonable promptness and no good cause for such failure "is an insurmountable defect to a sentence six remand." 2010 WL 3703292, at *6. See also Lockard v. Astrue, 2011 WL 4473607 (W.D. Pa. 2011) (belated submission of documents to Appeals Council does not satisfy good cause). In Lindsey the ALJ kept the record open for one month following the hearing, yet the claimant did not submit the additional records for an additional four months. Similarly, here, ALJ Appetta indicated she would keep the record open for thirty days after the hearing, and claimant submitted the records to the Appeals Council nearly four months later.

As to the required good cause showing by claimant, Clover points to the letter brief submitted to the Appeals Council by Clover's prior counsel and argues that it "demonstrates that he did not receive the records he requested until shortly before he filed his appeal and brief on February 18, 2014." [ECF No. 11 at 7]. Present counsel then adds that "[s]ince the undersigned did not represent Plaintiff during the administrative proceedings, he concedes that some speculation is necessary, but the only reasonable interpretation of the record is that [prior counsel] made every effort to obtain and submit these records." [ECF No. 11 at 7-8]. Clover's brief goes on to assert by conjecture what he now submits simply must have happened. Not only

10

is this speculation and conjecture it is actually contrary to the record and therefore, not a

reasonable interpretation of it. The February 18, 2014 letter to the Appeals Council from prior

counsel requesting review and enclosing the actual UPMC Mercy records states rather clearly

and in no uncertain terms that the records were not requested until October 31, 2013, R. at 7, and

therefore, were not requested the day after the hearing or with reasonable promptness as present

counsel would like for us to believe. Moreover, it appears that in hoping to create good cause,

present counsel neither offers any affidavit from prior counsel regarding the circumstances of the

belated request nor offers evidence of any attempts made to obtain an explanation as to the

belated request. Accordingly, Clover has not met his burden of showing good cause, and

therefore, he is not entitled to a Sentence Six remand. Our review of the ALJ's December 20,

2013 decision thus proceeds on the record as it was before the ALJ.

## B. Medical Evidence

Although Clover challenges the ALJ' s finding of his RFC as it relates to his cane use, we

review the ALJ's decision and consider the record as a whole to ensure that the ALJ's decision is

supported by substantial evidence. As an initial matter, the ALJ noted that the medical records

reveal that Clover has hypertension, hyperlipidemia, a September 2013 diagnosis of

cerebrovascular disease and sudden onset of dysarthria,[2] and recent low back pain. R. at 16, 298,

416, 417, 420, 455.  Brain imaging showed some evidence of prior silent strokes. R. at 420. As

to the low back pain, there were minimal physical exam findings of reduced mobility of the spine

with large joint degenerative changes, R. at 300, but no diagnostic tests regarding same and

treatment with Flexeril. A review of the medical records reveals that the hypertension,

---

[2] Dysarthria is a speech disorder consisting of imperfect articulation.  Dorland's Illustrated Medical Dictionary, 32nd Ed., p 575 (2012).

11

hyperlipidemia, and cerebrovascular disease were under appropriate medical and medicine management with no significant symptoms or complications. R. at 16, 455. The medical records of Dr. Egan, Clover's Primary Care Physician ("PCP") note acute kidney injury in August 2013, R. at 457, but there is no objective clinical or laboratory findings in the record regarding same. These impairments and the medical record regarding these impairments were considered by the ALJ and do not appear to have had any more than a minimal effect on Clover's ability to function, either singly or in combination as found by the ALJ. Indeed, Clover makes no mention in his brief regarding same with the focus, however, being on the condition of his knees and resulting pain. We find no error in the ALJ's determination regarding Clover's non-severe impairments.

1. Right Knee Injury

In 2006, Clover had a work-related injury that caused internal derangement of his right knee, R. at 328, for which he received 500 weeks of workers' compensation benefits. R. at 39-40, 163-166. Clover was initially treated with a knee immobilizer. R. at 328. A May 23, 2006 MRI showed small effusion and moderate osteoarthritis, medial and lateral menisci tears and an ACL rupture. R. at 331. On June 19, 2006, Clover underwent arthroscopic right knee partial medial/lateral meniscectomies, chondroplasty and loose body removal performed by orthopedic surgeon Dr. Mark Langhans. R. at 333-335. Physical Therapy was ordered and as indicated on the Medical Report Form completed by Dr. Langhans on July 13, 2006, and Clover was released to return to modified duty July 14, 2006 with sitting for 6-7 hours, standing 1-2 hours but no climbing, crawling, squatting, or push/pulls and only occasional bending. R. at 336.

12

Clover was treated by orthopedic surgeon Dr. Tucker beginning in June 2, 2009. R. at 391. An MRI demonstrated absence of the ACL likely torn due to chronic degeneration and a tear of the posterior horn of the medial meniscus, and some moderate degenerative changes of the medial knee compartment. R. at 399. The June 11, 2009 evaluation reflected reports of moderately severe pain by Clover starting in the evening with increasing frequency, conventional walking with an antalgic gait (connoting pain avoidance), and *genu varum* (bow-leggedness). Dorland's Illustrated Medical Dictionary, 32nd Ed., at p. 97, 771-772 (2012); R. at 397. Clover had full range of motion of the knee and ankle joint, but pain with flexion an extension. R. at 398. Dr. Tucker noted previous failed synvisc and steroid injunctions, and that Clover was treated with non-steroid anti-inflammatory drugs. R. at 398. Dr. Tucker diagnosed meniscus tears, osteoarthritis in the primary lower leg, sprained cruciate ligament, and chondromalacia of the medial compartment. R. at 398. In July of 2009, Clover presented with sudden onset of bad left knee pain that had increased over the previous three months, and Dr. Tucker assessed a left medial meniscus tear. R. at 395.

In August 2009, Dr. Tucker performed an ACL reconstruction and a partial knee replacement of the right knee with an arthroscopy and chondroplasty of the left knee. R. at 354, 389. Clover reportedly was doing well as of the September 2009 post-operative visit. R. at 387. The November 2009 visit noted more slow progression, that Clover reported an episode of "giving out" during the previous week's physical therapy, and that physical therapy was to be continued with weaning of the use of the brace and crutches. R. at 382. As indicated by the ALJ, there are no further records from Dr. Tucker. R. at 21.

13

Treating Orthopedic surgeon Dr. Gregory Habib examined and treated Clover beginning in February 20, 2012. R. at 264. He indicated that Clover after the August 2009 surgery still experienced knee pain and discomfort as well as knee instability. X-Ray records showed the right knee partial replacement was in good alignment and position and a stable Endobutton in his femur. Although the bone tunnels were stable on the tibial side, there was some concern on the femoral side. Dr. Habib diagnosed a stable right partial knee replacement and an unstable ACL allograft, chondromalacia patella, and prepatellar inflammation. R. at 412. Dr. Habib first treated Clover with an injection, continued prescription of Vicodin and Percocet for pain, and sized and fitted Clover for an ice wrap and crutches. R. at 412-414. As a result of Clover's continued pain and instability in the knee, on March 28, 2012, Dr. Habib performed arthroscopic surgery on Clover's right knee with a partial meniscectomy, major synovectomy, and debridement. R. at 408. Clover's had post-operative visits with Dr. Habib and physical therapy from April to June of 2012. R. at 259-271. Dr. Habib noted in his June 11, 2002 evaluation that Clover had continued medial join line pain in his right lower extremity, but the exam revealed no palpable effusion or cellulitis, and no pain of the lateral joint line, a stable IT band, stable MCL and LCL with no pain, no discomfort at the popliteal aspect, negative Homans' sign, and that he was neurovascularly intact. R. at 269. Dr. Habib prescribed physical therapy focusing on quad strength. R. at 269. As indicated by the ALJ, there are no further treatment records from Dr. Habib. R. at 22.

## 2. Dr. Habib's Opinions

On July 2, 2012, Dr. Habib completed a Physical Capabilities Checklist, opining that Clover was capable of full time light work with no bending, kneeling, squatting, or

14

pivoting/turning/twisting and stairs as needed. R. at 263. Then on August 1, 2012, Dr. Habib completed a Medical Source Statement opining that Clover could lift and carry up to 25 pounds frequently and 50 pounds occasionally, that Clover could stand/walk for 4 hours and sit for four hours, could occasionally climb stairs as needed but never balance, and could occasionally stoop and bend. R. at 267.

The ALJ gave significant weight to the July 9, 2012 and August 1, 2012 opinions of the current treating orthopedic surgeon, Dr. Habib. R. at 24. The ALJ, however, included in her RFC Dr. Habib's restrictions and added the continued need by Clover of the use of a cane for ambulation.

### 3. Dr. Richard Egan

The records of Clover's PCP Dr. Egan reflect osteoarthritis of both knees and treatment with ibuprofen for pain and ongoing treatment for diabetes, hypertension and hyperlipidemia. Weight loss was advised. R. at 292-322, 451-479. February 2011 office notes also reflect a report by Clover of continued knee problems and that at that time he was exercising vigorously at the gym. R. at 307. Dr. Egan opined in October 31, 2013 that Clover was not capable of gainful employment R. at 451. The ALJ gave Dr. Egan's opinion little weight because the ALJ gave greater weight to the treating orthopedic surgeons regarding Clover's knee impairments and because Dr. Egan's opinion of disability related to Clover's knee impairments was not supported by the record as a whole and Dr. Egan's treatment records, and as to his other conditions treated by Dr. Egan, the diabetes and hypertension had only worsened over the past year. R. at 25.

### 4. Dr. Langhans

15

Dr. Langans completed Medical Report Forms from June to July 2006, R. at 336-338, and there also were completed physician activity status reports from Concerta Medical Centers, 11F, R. at 347, which indicated various restrictions and that Clover could return to work. R. at 347-352. The ALJ found the forms of minimal probative value as they related to Clover's initial work injury and his first operation on his knee and contained no explanation or clinical findings R. at 24. As stated by the Court of Appeals for the Third Circuit in Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cri. 1993), "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." Where such reports are not accompanied by a thorough written report, the reliability of such form reports is considered suspect. Mason, 994 F.2d at 1065 (citing Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir.1986); Green v. Schweiker, 749 F.2d 1066, 1071, n. 3 (3d Cir. 1984)).

### 5. IME by Dr. Thomas, IRE by Dr. Klein and IME by Dr. Brockmeyer

An Independent medical Evaluation ("IME") was performed in July of 2007 by Dr. Stephen Thomas. The July 2007 IME by Dr. Thomas indicated Clover complained of pain with long walks and his knee occasionally giving way and that Clover took his cane with him on long walks. R. at 343. Clover's right knee showed only mild effusion and showed no erythema, excessive edema, calf tenderness, or quad atrophy. R. at 343. Dr. Thomas opined that as of the July 9, 2007 IME, Clover had not reached maximum medical improvement, no longer suffered from the meniscal tears but did suffer from arthritic irritation, the cruciate tear was not contributing to his ongoing problems, and he should continue physical therapy for 4-6 weeks for conditioning of his lower extremities. R. at 344. Dr. Thomas opined that Clover was capable of doing full time sedentary and light work. R. at 345. Dr. Thomas completed a Return to Work

16

Evaluation Form in July 2007 indicating that Clover could sit 3-4 hours, stand 1-2 hours, walk 1-2 hours and drive 3-4 hours, lift and carry 11-25 pounds occasionally, bend occasionally, reach and twist frequently, but could not climb, crawl, knee, or squat. R. at 346. The ALJ gave Dr. Thomas' opinion some weight as it was consistent with his medical finding but related to Clover's condition prior to the August 2009 and April 2012 surgeries. R. at 24.

Dr. Milton Klein completed an Impairment Rating Evaluation in July of 2008 regarding Clover's occupational injury. R. at 323. The examination revealed right knee medial/lateral joint line focal tenderness, a mild degree of effusion, and range of motion with restriction in flexion to 90 degrees and restriction in extension to 30 degrees. R. at 324. Dr. Klein observed that Clover was ambulatory with a right stiff-legged limping gait, and diagnosed right knee pain, immobility, internal derangement, and gait dysfunction. R. at 325. Dr. Klein opined that Clover had a 10% total whole person permanent impairment and 25% lower extremity impairment. R. at 325. The ALJ considered that the evaluation related to Clover's workers compensation claim and because the standards for workers compensation and disability for purposes of the Social Security Act differ, a finding of entitlement to workers compensation or disability in that context does not compel a finding of disability. The ALJ likewise gave Dr. Klein's opinion some weight as consistent with his medical finding but having being given prior to the August 2009 and April 2012 surgeries. R. at 24.

Dr. Brockmeyer is a non-treating orthopedic surgeon, who performed an Independent Medical Examination on behalf of the Worker's Compensation insurance carrier on September 12, 2013. R. at 447-450. Dr. Brockmeyer observed that Clover had a marked straight right limb, moderate soft tissue swelling in the right knee, and marked crepitus with range of motion,

17

moderate synovitis and moderate effusion. R. at 450. Dr. Brockmeyer also opined that Clover had not reached maximum medical improvement and indicated that Clover had reported that Dr. Habib had recommended hardware removal and conversion to a total knee replacement, with which Dr. Brockmeyer concurred. R. 450. Dr. Brockmeyer opined that Clover was currently disabled from his work duties. R. at 450. The ALJ gave limited weight to Dr. Brockmeyer's opinion as it was related to the worker's compensation evaluation as to whether Clover could return to his prior work as opposed to the standard for disability under social security, based on the ALJ's determination as well finding that Clover could not perform his past relevant work, and based on Dr. Brockmeyer's indication that Clover has not reached maximum medical improvement. R. at 25.

### 6. Dr. Abu Ali

The State Agency medical consultant, Dr. Ali on initial review on August 2012, R. at 77-94, opined that Clover could perform light work except that his posturals as to climbing, balancing, stooping, kneeling, crouching and crawling were limited to occasionally due to the right knee impairment and that further that he should avoid even moderate hazard exposure. R. at 82, 94. The ALJ gave Dr. Ali's opinion limited weight as Dr. Ali did not observe Clover and did not have the opportunity to consider additional medical evidence that was submitted subsequent to his review. R. at 24.

### 7. Eye Condition Evidence in the Record before the ALJ

Claimant testified at the September 30, 2013 hearing that he had recent eye surgery for retinal detachment and diabetic retinopathy. R. at 46. Dr. Brockmeyer's IME reports from September 12, 2013, approximately one month after the reported eye surgery and prior to the

18

hearing before the ALJ, does not indicate complaint from Clover regarding his vision, but did note that Clover was wearing a patch on his left eye. R. at 450. Records from St. Clair Hospital on September 18, 2013, reflected Clover's pupils were equal, round, and reactive to light, and that his extraocular motions were intact without nystagmus (repetitive uncontrolled movements), Dorland's Illustrated Medical Dictionary, 32nd Ed., at p. 1308. R. at 421. The records did reveal ptosis (eyelid droop), Dorland's Illustrated Medical Dictionary, 32nd Ed., at p. 1551. R. at 421. Although the PCP's notes from August 2013 lists diabetic macular edema and retinal detachment, it did not provide any objective findings, or laboratory results or tests. R. at 457. Furthermore, Dr. Egan's October 4, 2013 office visit notes, R. 451-456, reveal that Clover did not report with complaints about his vision or eyes and on exam did not have red eye or icterus (yellowing of the eye due to jaundice), Dorland's Illustrated Medical Dictionary, 32nd Ed., at p. 911. R. at 454. Diabetic retinopathy was not indicated as a current medical problem by the PCP as of October 4, 2013. R. at 455.

As pointed out by the Commissioner, on questioning at the hearing, Clover did not report eye or vision problems as a reason he could not work nor did he identify any eye related restrictions. [ECF No. 13 at 13]; R. at 32-74. Indeed, Clover testified that no physician had placed medical restrictions on his driving due to any vision problems. R. at 46. As there were no objective medical findings in the record before the ALJ to substantiate the diagnosis of diabetic retinopathy or loss of vision, the ALJ did not find it to be an impairment in accordance with SSR 96-4p. R. at 16 (citing SSR 96-4p ("No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence

19

of a medically determinable physical or mental impairment.")). We can find no error on the record that was before the ALJ.

## C. Determination that Clover's Statements concerning the Intensity, Persistence and Their Limiting Effects were not entirely Credible

The ALJ determined that Clover's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Clover's statements concerning their intensity, persistence and limiting effects as to pain and the extent of his functional limitations were not entirely credible. R. at 23. Though Clover makes no challenge to the ALJ's determination regarding his credibility, we briefly address it. "An ALJ must explain the degree to which a claimant's testimony is credited." Chandler, 667 F.3d at 362. "Although any statements of the individual concerning his or her symptoms must be carefully considered, SSR 96-7p (July 2, 1996), the ALJ is not required to credit them." Chandler, 667 F.3d at 363 (citing 20 C.F.R. §404.1529(a)). "In concluding that some or all of a claimant's testimony is not credible, the ALJ may rely on discrepant medical evidence and the claimant's inconsistent statements." Jones v. Astrue, 2012 WL 3279256 at * 2 (E.D.Pa. 2012).

In Chandler, for example, the Court of Appeals for the Third Circuit found that the ALJ had substantial evidence to conclude the claimant was not credible regarding her testimony of extreme pain. The claimant indicated that she had extreme pain and even had reported to doctors that it allegedly required her to lie down most of the day, but she also testified at the hearing that she shopped several times per week, cooked dinner, cared for her two children and visited with friends. 667 F.3d at 363.

The ALJ explicitly stated that he did not find Clover fully credible and gave specific reasons as to the basis for his finding, including the objective medical findings, the nature of his medical care and his activities of daily living despite chronic knee pain. R. at 15-18; see Ridenbaugh v. Barnhart, 57 Fed.Appx. 101, 105 (3d Cir. 2003)(considering type of pain medication used by claimant and her declining to engage in treatment to ameliorate her impairments in upholding ALJ's decision finding her statements not fully credible).

Here, as observed by the ALJ, Clover's Function Report provided that he could prepare a sandwich or microwave meal, performing some daily household chores such as loading the dishwasher or doing three loads of laundry, drive to the store, walk regularly, exercise with bands almost daily, participate in family functions and social activities monthly, go out to eat and shop, and drive during the day. R. at 18, 23, 51-55, 220, 225. He also provided that he could perform certain activities of daily living and take care of his personal needs.

The ALJ noted that Clover has given inconsistent statements regarding when he was first prescribed the cane and when he used it. R. at 23. In prior written statements, R. at 219, Clover provided that the cane was prescribed after his first knee surgery and used when he walked outside or felt unstable. The July 2007 consultative exam by Dr. Thomas, indicated Clover's use of the cane for long walks. R. at 343. Then at hearing September 30, 2013, Clover testified had had been prescribed the cane and a walker after his last knee surgery. R. at 58-59. He further testified to using the cane whenever he goes out. R. at 59. The ALJ ultimately did find based on the record, including Clover's subjective complaints, that Clover requires the cane for ambulation.

21

The ALJ noted in his review of the medical evidence that the surgical procedures for Clover's right knee appear generally successful and have documented some effusion and tenderness and reports by Clover of instability. R. at 23. As to the left knee, the medical record reflects that Clover had good recovery, with few complaints or findings on examination after the 2009 surgery. Clover is prescribed Ibuprofen and Vicodin for pain and Ambien which has been effective in helping him sleep. The ALJ also supported his credibility finding by noting that the post-surgical medical records demonstrated medial joint line tenderness that did not support Clover's subjective reports of pain and instability. In sum, the ALJ's credibility assessment of Clover properly took into consideration his testimony, the medical record, medication, and Clover's activities.

Consistent with the foregoing, we find that the ALJ complied with his duty to consider the medical record and Clover's testimony, explained the weight given to the physicians and applied the proper legal standard in assessing Clover's credibility. As the finder of fact, the ALJ is required to review, properly consider and weigh all of the medical records provided concerning the claimant's claims of disability. Fargnoli, 247 F.3d at 42 (citing Dobrowolsky v. Califano, 606 F.2d 403, 406-07 (3d Cir.1979)). The ALJ's residual functional capacity finding was detailed and credited Clover with numerous limitations, including the limitation of Clover needing a cane for ambulation. The ALJ also comprehensively reviewed and accounted for the medical evidence in rendering his opinion, providing a logical bridge between the medical record and his determination. Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996) (The ALJ's reasons for her findings must build "an accurate and logical bridge between the evidence and the result."). As we have determined that the ALJ's finding that Clover had the residual functional

capacity to perform light work with exceptions is supported by substantial evidence and that the ALJ properly considered Clover's use of a cane for ambulation in that RFC finding, Clover's challenge to the RFC found by the ALJ is unavailing.

### D. Reliance on Vocational Expert's Testimony

Clover challenges the ALJ's reliance on the VE's testimony. The VE testified, R. at 63-72, regarding the hypothetical posed that, based on the residual functional capacity as ultimately found by the ALJ, a person limited to light work, that cannot climb ropes, ladders, or scaffolds, cannot kneel and cannot climb stairs as a requirement for the job, cannot crawl, can only occasionally perform postural maneuvers, and must avoid hazards and vibrations, and requires use of a cane for ambulation, with considerations of Clover's age, education, and work experience, as to whether jobs exist in significant numbers in the national economy that the person could perform, that such a person could perform the occupations of assembler, ticket seller, and order caller. R. at 19-20, 70-71.

Clover contends that the ALJ failed to account for the impact of his cane use on his ability to "reach, handle and grasp" as Clover would have the cane in his hand. [ECF No. 11 at 10]. Thus, according to Clover, he had hand use limitations that were not accounted for in the RFC and were compounded when the VE did not consider hand use limitations in her response to the hypothetical. [ECF No. 11 at 10]. Clover argues that "according to SSR 96-9p, the need to use an assistive device must be considered, in addition to the inherent reaching/handling types of limitations, in light of the likelihood that 'the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities . . . may

23

be significantly eroded.'" [ECF No. 11 at 11]. SSR 96-9p relates to "Implications of a Residual

Functional Capacity for Less than a Full Range of Sedentary Work." The ALJ, however,

determined that Clover had the RFC for light work with restrictions and as such SSR 96-9p

would not appear to apply. Nevertheless, SSR 96-9p instructs regarding the use of medically

required hand-held assistive device as follows:

> an individual who must use a hand-held assistive device to aid in walking or
> standing because of an impairment that affects one lower extremity (e.g., an
> unstable knee), or to reduce pain when walking, who is limited to sedentary work
> because of the impairment affecting the lower extremity, and who has no other
> functional limitations or restrictions may still have the ability to make an
> adjustment to sedentary work that exists in significant numbers. On the other
> hand, the occupational base for an individual who must use such a device for
> balance because of significant involvement of both lower extremities (e.g.,
> because of a neurological impairment) may be significantly eroded.

SSR 96-9p. SSR 96-9p further provides that:

> The vocational resource may be asked to provide any or all of the following: An
> analysis of the impact of the RFC upon the full range of sedentary work, which
> the adjudicator may consider in determining the extent of the erosion of the
> occupational base, examples of occupations the individual may be able to
> perform, and citations of the existence and number of jobs in such occupations in
> the national economy.

Id.

Clover also cites SSR 83-14, arguing as well that "as required by SSR 83-14, *any*

limitation of the functional abilities required for light work 'must be considered very carefully to

determine its impact on the size of the remaining occupational base of a person who is otherwise

found functionally capable of light work.'" [ECF NO. 11 at 11] (quoting SSR 83-14 [Evaluating

A Combination of Exertional and Nonexertional Impairments]). Clover then argues that "the

jobs offered by the vocational expert in response to the ALJ's hypothetical/RFC require either

24

constant or frequent hand use functions of reaching, handling and fingering." [ECF No. 11 at 12].

Clover does not point to medical evidence in the record before the ALJ that the ALJ improperly ignored. Indeed, in considering Clover's osteoarthritic knees and subjecting indication of resulting pain, the ALJ determined that Clover needed a cane to walk and specifically included it in the Clover's RFC. Our review of the medical record as a whole and the ALJ's decision detailing the various medical records and Clover's testimony does not reveal any failure to consider the evidence in making her decision. When specifically asked to consider the use of a cane for ambulation and how that would erode the occupational base, the VE testified that certain positions, specifically the positions of marker and sorter, R. at 70, would be eliminated from the light work base for the RFC, but that the jobs of ticket seller, assembler, and order caller still could be performed with use of a cane for ambulation. R. at 70-71.

Clover points out that under SSR 00-4p, to ensure that the VE's testimony is consistent with regulations and agency policies, the ALJ is required to consider any inconsistency with the three jobs identified by the VE and the Dictionary of Occupational Titles' (DOT) description, indicating that those jobs require frequent reaching/handling/fingering. [ECF No. 14 at 2]. The issue as to any conflict between the DOT and the jobs that the VE indicated that Clover could perform was not raised at the hearing by Clover. Nevertheless, the ALJ specifically elicited testimony from the VE regarding the impact of Clover's specific RFC on light work, and also on the occupational examples provided by the VE in her testimony. R. at 70-71.

The ALJ not only acknowledged SSR 00-4p in her opinion, she specifically indicated that she found the DOT consistent with the VE's testimony. R. at 27. At the hearing, the ALJ

25

probed the VE regarding the use of a cane for ambulation, and also probed the VE as to whether her testimony was consistent with the DOT, to which the VE responded it was. R. at 74.

Based on the foregoing, we find that the VE's testimony that a person with Clover's RFC to perform light work with limitations, and with the further specific limitation of use of a cane for ambulation could perform jobs that existed in significant numbers in the national economy constituted substantial evidence supporting the ALJ's determination that Clover was not disabled. See McDowell v. Astrue, 2012 WL 4499283, at *3-4 (W.D. N.C. September 28, 2012) (ALJ appropriately relied on VE testimony that plaintiff could perform a significant number of jobs in the light work category despite use of a cane for walking and such testimony satisfied SSR 96-9p); Profitt v. Commissioner of Soc. Sec., 2010 WL 3703214, at *8 (S.D. Oh. Aug. 23, 2010) (VE testimony with inclusion of use of cane in hypothetical constituted substantial evidence on which ALJ could rely).

Accordingly, the ALJ was entitled to rely on the vocational expert's testimony based on the ALJ's finding of Clover's residual functional capacity in ultimately determining that Clover was not disabled. We find that the Commissioner's decision is based on substantial evidence and will not disturb it.

## V. Conclusion

For the foregoing reasons, we determine that Clover is not entitled to a Sentence Six remand as he failed to sustain his burden to show good cause for failing to provide the records to the ALJ, and furthermore, based upon our review of the record as a whole, we hold that the decision of the Commissioner that Clover was not disabled is supported by substantial evidence.

Accordingly, an appropriate order will be entered granting the Commissioner's motion for

summary judgment and denying Mr. Clover's motion for summary judgment.

July 25, 2016

Maurice B. Cohill Jr.
Maurice B. Cohill, Jr.
Senior United States District Court Judge